UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

CRIMINAL NO. 22-20184

vs.                                          HON. LAURIE J. MICHELSON

D-1 ALBERT MORRISON,

Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

## INTRODUCTION

Public school districts are governed by elected school board members who serve as representatives and advocates for their community. Families trust and depend upon each school board member to prioritize the interests of the district and its students. Instead of prioritizing the Madison District Public Schools, Albert Morrison prioritized his greed. For years, Morrison disguised his lies, corruption, and betrayal from the school officials and families of Madison District Public Schools. In public, he emphatically declared during a public school board meeting:

| | |
|---|---|
| Board Member: | Now the question, uh, is do you have any financial ties to Emergency Restoration? |
| MORRISON: | No financial ties to Emergency Restoration whatsoever. |
| Board Member: | You don't receive any money from them whatsoever? |

1

MORRISON:      No money from them whatsoever.

*See* Exhibit 1, Transcript of Madison District Public Schools Board Meeting 7/12/17[1]; First Superseding Indictment, ¶ 49 (ECF No. 14, PageID.103). In private, he was accepting hundreds of thousands of dollars from John David, the owner of Emergency Restoration, and principal contractor for the Madison District schools. Morrison's deception extended to state and federal government. He hid David's payments from State of Michigan auditors and from the Internal Revenue Service.

Morrison's corruption shattered the culture of trust and transparency between the school board and the community he served. Because of his egregious conduct and the need to deter others who are similarly situated in a position of trust, the government requests that this Court impose a sentence within the applicable guideline range.

## **BACKGROUND**

## **SENTENCING GUIDELINE CALCULATIONS**

On April 25, 2023, Morrison pleaded guilty with a negotiated plea agreement. The Probation Department calculated a guideline range of 108-135

---

[1]The Federal Bureau of Investigation requested all recordings of Madison District Public Schools board meetings from the school board. The recordings, including the July 12 video, were produced to the Federal Bureau of Investigation on April 13, 2022.

months (PSR ¶ 81) after determining that the following offense characteristics and

enhancements applied:

> § 2C1.1(a)(1): base offense for a public official ………………………14
> § 2C1.1(b)(1): more than one bribe ………………………………...+2
> § 2C1.1(b)(2)(H): bribe amount >$550,000 but <$1,500,000…………..+14
> § 2C1.1(b)(3): public official in a high-level decision-making position…+4

PSR at ¶¶ 27-30. During the sentencing of co-defendant John David, the Court

concluded that John David paid Morrison more than one bribe and that the bribe

amount was over $550,000. Accordingly, § 2C1.1(b)(1)(more than one bribe) and

§ 2C1.1(b)(2)(H)(bribe about over $550,000) are both applicable to Morrison.

When combined with a criminal history category of I and a reduction for

acceptance of responsibility, the resulting sentencing range is 108-135 months.

There are two caps within this guideline range: (1) the statutory maximums cap

Morrison's sentence at 120 months (PSR ¶ 81); and (2) Morrison's plea agreement

contains a cap at the midpoint of the guideline range as determined by the Court.

(PSR ¶ 83). Accordingly, the applicable guideline range is 108-120 months.

## **APPLICATION OF 18 U.S.C. § 3553**

Title 18, United States Code, Section 3553(a) requires the Court to impose a

sentence that is "sufficient, but not greater than necessary" to comply with the

purposes of sentencing. To determine the particular sentence to impose, this Court

must consider the familiar statutory factors listed in § 3553(a)(1)-(7). An

application of the sentencing factors to this defendant justifies a sentence at the middle of the guideline range.

**A.  The Guidelines are the Lodestar in Sentencing.**

Although the sentencing guidelines are no longer mandatory, they are guiding and instructive. The guidelines are the "starting point" and "initial benchmark" for determining an appropriate sentence. *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020)(quoting *United States v. Bistline*, 665 F.3d 758, 761 (6th Cir. 2012) and *Gall v. United States*, 552 U.S. 38, 49 (2007)). The Guidelines are not only the starting point for most federal sentencing proceedings but also the loadstar. *Molina-Marinez v. United States*, 578 U.S. 189, 200 (2016). So, in the instant case, the applicable sentencing range should guide the Court to a sentence of 120 months.

**B.  The Nature and Seriousness of the Offense and the History and Characteristics of the Defendant**

1.  Nature and Seriousness of the Offenses

The nature and circumstances of Morrison's repeated acts of corruption and evasion of taxes are serious.

During his corruption scheme, Morrison flagrantly violated many of the most essential school board rules and obligations as outlined in the MDPS governing bylaws:

➢ Render all decisions based on the available facts and independent judgment, and refuse to surrender that judgment to individuals or special interest groups.

➢ Avoid being placed in a position of conflict of interest, and refrain from using their Board positions for personal partisan gain.

➢ Remember always that their first and greatest concern must be for the educational welfare of the students attending the public schools.

➢ No Board member shall use his/her position as a Board member to benefit either himself/herself or any other individual . . . apart from the total interest of the School District.

➢ When a member of the Board determines that the possibility of a conflict of interest exists, s/he should, prior to the matter being considered, disclose his/her interest (such disclosure shall become a matter of record in the minutes of the Board), and thereafter shall abstain from participation in both the discussion of the matter and the vote thereon.

➢ Board members shall not accept any money, goods, or services with a value in excess of the amount established annually by the State Department of Instruction ($44 within any one (1) month period as of December 31, 2004) from any person who does business or seeks to do business of any kind with the District.

The families of MDPS relied upon Morrison to follow these rules and handle taxpayer money without the influence of self-interest. As school board president, Morrison should have focused on the collective needs of the community. Instead, Morrison allowed his judgment to be fundamentally compromised by the lure of cash. Morrison's position as president gave him power to mislead the board and the community. Instead of using his power to preserve the limited money allotted to the district, he allowed himself to be corrupted by the power.

5

Morrison vacationed and gave himself the lifestyle he wanted with the money he received from David. Morrison used funds from Comfort Consulting for his own personal expenditures including:

- Cars: Camaro[2] and Dodge Ram
- Vacations: Key Largo, Florida, and SeaWorld
- Residential rent: $54,947.36
- Restaurants: fast food, bars, and corporate restaurants
- Dentist and veterinary visits
- Shopping: Costco, Best Buy, Bed Bath and Beyond, jewelry stores, party stores, and gas stations

Serving as a public official with integrity and transparency is essential to fostering public trust. A lack of transparency causes dissension with the families in the district and with school staff and administrators. This is precisely what happened in the Madison District Public Schools. As illustrated by the following passages from the Victim Impact Statement of a school board member, Morrison is responsible for fiscal damage to the district as well as damaging the faith the Madison District Public Schools community had in their school board:

> When I was first elected, the district was over $8 million in deficit. By the time I left, in December 2012, the district had a surplus of $5.5 million. We had the fund equity to pay for any needed repairs and maintenance. We had a fiscally promising future.
>
> * * * *
>
> Mr. Al Morrison and his conspirators took our surplus, and squandered it. They took advantage of our district in many ways . . .

---

[2] *See*  Exhibit 2, Victim Impact Statement.

6

The school district ran a bond in 2013. The bond was passed by our residents in good faith. Mr. John David, and his company Emergency Restoration, began acting as our construction manager -- without board approval or public disclosure. He accepted no bid contracts, and admitted to a "pay to play" scheme, where he made payments to Albert Morrison, the board president.

Because of their crimes, our students have suffered missed opportunities and educational experiences. It is sad to think about the impact that this money could have had on our students, if it had been redirected to their classrooms during the many years this took place.

The systematic betrayals of Mr. Morrison, with the help of Mr. David, have been extremely damaging. These failures – and the lies to employees, alumni and parents – have split our community, our board, our taxpayers. We have lost hundreds of students, due in part to these crimes.

This has robbed us of receiving a fair, equitable return on our bond investment. It has permanently injured our school district and its reputation.

The current board members are trying to recover the public's trust. We are working very hard to show that our district's needs will be met – now, and in the future.

I would like to remind Your Honor that this was a crime that took place, consistently and consciously, over many years. It was not a one-time event. It was done with intention – and our kids were the victims.

* * * *

I believe the maximum sentence allowable is in order for Mr. Morrison for the harm he has caused to the School District and the community, but mostly to the students of Madison District Public Schools.

Victim Impact Statement, Exhibit 3.[3]

---

[3]The Victim Impact Statements received by the government as of August 18, 2023, are submitted as Exhibits 2 - 5.

Undeniably, Morrison caused financial harm, cast a stain on the district, and undermined the trust of its members and the general public. The secrets Morrison kept from the community for years is striking and disturbing. As a public official, Morrison knew it was wrong to accept money from David and to avoid the competitive bidding process. Yet, he placed his desire for personal enrichment ahead of his responsibility as an advocate and representative of the community.

To maintain the corrupt payments to him and avoid detection, Morrison bullied school administrators who attempted to determine why Emergency Restoration was receiving all of the work in the district; he lied to State of Michigan auditors who were investigating the relationship between the district and Emergency Restoration; and he lied to the Internal Revenue Service. By not reporting the payments from David, he evaded the payment of approximately $118,000 in taxes. So, Morrison's scheme earned him over $561,000 and saved him $118,000 in tax payments.

This criminal activity was not the result of a spontaneous decision borne out of financial distress; rather, his law breaking was generated and prolonged by daily and hourly decisions and it was within his sole power to cease his criminal activity, lies, and disloyalty at any point.

8

2.    Characteristics of the Defendant

Morrison sought election as school board president despite his history of

non-compliance with the law. PSR ¶ 49. Once the families of the Madison District

Public Schools elected him, he committed to following the rules of the district.

Instead, he blatantly ignored the district's competitive bidding protocols and

covered up his corrupt acts by designating every project awarded to Emergency

Restoration as an emergency. Rather than protecting taxpayer money, Morrison

made deliberate choices, not in the heat of passion, but after careful deliberation.

When Morrison was confronted with concerns about his actions and relationship

with David, he bullied or lied to anyone who threatened the bribe payments that

were his most significant source of income. Morrison's bullying was well known

throughout the district. A Victim Impact Statement describes Morrison's character

when he was questioned about his financial decisions:

> During 2016-2018, I started inquiring Madison Public School
> Districts financial transactions, as they were asking for another mileage.
> During that time I asked questions of School board members; including Mr.
> Morrison via the districts social media pages, concerning some of the
> transactions.
>
>      . . . I was berated, slandered and threatened by Mr. Morrison and his
> family. . .  His sons threatened my . . .  [teenage] son saying they hoped he
> would be hit by a bus and killed. His son . . .  sending in Facebook
> messenger "Good luck to your son in the future because karma is a bitch." I
> was told to "watch your back" when out in the city by his sons, sister, nieces
> and nephews.

9

I applied for a Board of Educations vacant position during this time, during my videoed interview Mr. Morrison badgered me, called me a liar, mocked me that I wasn't there "for the kids", accused me of trying to make him look bad with my "false accusations" on him, all the while knowing he was stealing from the district. the position was given to someone who would not question them. There is a video of another Board of Education meeting when Mr. Morrison was voted out as president and he specifically said my name and called me a liar for all of the people in the district to see, again knowing full well he was stealing but chose to slander my name.

* * * *

A person should not have to worry when inquiring where their tax money is going within the district. The actions of Mr. Morrison and his family against my family were because his wrong doing was starting to be discovered. This behavior was unacceptable causing unnecessary stress on my minor son, myself and family.

Victim Impact Statement, Exhibit 4.

His willingness to abuse the trust of the families of MDPS, to bully his fellow administrators and community members, to lie to the Internal Revenue Service, and to lie to State of Michigan auditors speaks loudly about his character and integrity and justifies a sentence within the guideline range.

Based upon the information currently known to the government, there is no need to adjust Morrison's sentence below the guideline range under §3553(a)(2)(D) based upon his medical conditions as described in the PSR. The government acknowledges that Morrison has significant health conditions. The government requested medical documentation regarding his current medical

10

conditions.  However, medical documentation was not provided as of August 20, 2023.

According to the information known by the government, Morrison appeared to be able to carry out the necessary functions of daily living based upon the government's investigation as of the Spring of 2023. He had a Michigan driver's license and was able to walk unassisted into his home. As of August 5, 2023, he appeared well enough to host a party.[4]

The government also submits that Morrison's chronic conditions, as described in the PSR, can be managed by the Bureau of Prisons (BOP). Prior to his designation, the BOP will review Morrison's medical conditions and assign him a classification according to the "Care Level Classification for Medical and Mental Health Conditions or Disabilities." *See*  https://www.bop.gov/resources/pdfs/ care_level_classification_guide.pdf. The classification guide ensures that each inmate is assigned to the BOP institution that can best meet their health care needs. As evident from the classification guide, the Bureau of Prisons is capable of handling even the most complicated and severe medical issues.  The Regional Medical Director for the BOP provided a letter assuring that Morrison's conditions can be properly managed while he is incarcerated with the BOP.

---

[4] *See* Exhibit 2, Victim Impact Statement.

11

*See* Exhibit 6, Letter from BOP Regional Medical Director (filed under seal). The Medical Director's letter further explains Morrison's probable classification under the Care Level Classification Guide and likelihood of designation to a Medical Referral Center.

### C.     Respect for the Law and Just Punishment

The Court's sentence for Morrison's crimes needs to promote respect for the law and impose just punishment for his misconduct. Morrison was a trusted school official, and he intentionally breached the trust of his fellow board members and the residents of the district for over four years. The Madison District Public Schools community believed that their school board president was protecting their money, not diverting the money to his friend John David.

The laws and rules applicable to school boards are purposeful. Adherence to those rules, which include full disclosure, encourages and fosters public trust. With candor and full disclosure, community members are more educated and empowered regarding district issues, problems, and successes. When families are kept candidly informed of the decisions of the school board members, they can be more engaged and involved in the district. A community that collaboratively works with its school board has a positive effect on schools and students.

The rules and regulations of the Internal Revenue Service also are purposeful: to fund our federal government and support all of our federal

programs, including our local school districts. The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. We are all subject to the rules and Morrison was no exception. This Court ought to appropriately recognize Morrison's failure to follow the tax laws that apply to all who benefit from the privileges of living in the United States and the protections and programs provided by the federal government.

This Court should impose a guidelines prison sentence for Morrison's wrongdoing to vindicate the rules of law applicable to both of his offenses and considering such long-standing and extensive criminal conduct.

### D.    Deterrence

"Sentences influence behavior" *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)(*quoting United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)), and this is why deterrence is such an important sentencing factor. Public officials and private sector employees who are inclined to engage in corrupt practices are capable of being deterred and word of significant penalties for such conduct travels quickly and widely within professional and personal networks. A sentence within the guideline range would send the message that there are serious consequences for public corruption and, accordingly, should have a significant deterrent effect. As noted in *United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013), because white-collar crimes are "'more rational, cool, and calculated than sudden

crimes of passion or opportunity, these crimes are prime candidates for general deterrence.'" *Peppel*, 707 F.3d at 637 (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)). And, as aptly stated by a federal court plagued by corruption in its district:

> Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all --- not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano,* 411 F.Supp.2d 923, 940 (N.D. Ill. 2006).

Current and future elected leaders in our district where public corruption is a pervasive problem, *see* https://www.dailytribune.com/2019/06/03/us-attorney-michigan-leads-nation-in-public-corruption-cases/, must understand that substantial abuses of trust will be severely punished. Given the importance of the financial integrity of our public schools, general deterrence is an important component of the Court's sentence. It is imperative that school board members conduct themselves at the highest level of honesty, integrity, and transparency and recognize the importance of establishing and cultivating a culture of trust,

communication, and transparency between the board and community. School officials need to hear loud and clear that failure to follow the rules designed to foster trust and protect the financial stability of school districts will be punished.

General deterrence is a significant factor applicable to his tax offenses as well. Compliance with tax laws is essential to keep our system working and to support the programs and services that protect and improve lives. Tax evasion frustrates the government's efforts to collect much-needed tax revenues. A guidelines sentence will encourage the filing of tax returns and reporting income to the Internal Revenue Service by people like Morrison who take full advantage of all the services paid for by tax revenue. As the United States Sentencing Commission has explained, "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators." U.S.S.G. Ch. 2, Part T, intro. Cmt. And, notably, where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence. *See generally* Louis Kaplow and Steven Shavell, Fairness Versus Welfare, 114 Harv. L. Rev. 961, 1225-1303 (2001); *see also* Joshua D. Blank, In Defense of Individual Tax Privacy, 61 Emory L.J. 265, 321 (2011-2012)("[s]tudies

15

have shown that salient examples of tax-enforcement actions against specific

taxpayers, especially those that involve criminal sanctions, have a significant and

positive deterrent effect.").

### E.   A Sentence within the Guidelines will Help Avoid Disparities.

The sentencing guidelines help courts avoid disparities of similarly situated

defendants. In other words, "[t]he Guidelines exist to help ensure that

similarly-situated defendants are punished similarly." *United States v. Vassar*, 346

Fed.Appx. 17, 29 (6th Cir. 2009)(citing *United States v. Boscarino*, 437 F.3d 634,

638 (7th Cir. 2006)). Section 3553(a)(6) instructs courts to consider "the need to

avoid unwarranted sentence disparities among defendants with similar records who

have been found guilty of similar conduct." That subsection "is concerned with

national disparities among the many defendants with similar criminal backgrounds

convicted of similar criminal conduct." *United States v. Benson*, 591 F.3d 491, 505

(6th Cir. 2010). And indeed, one of the "central reasons" for adopting the

sentencing guidelines in the first place "was to ensure stiffer penalties for white-

collar crimes and to eliminate disparities between white-collar sentences and

sentences for other crimes." *United States v. Peppel*, 707 F.3d 627, 638-39 (6th

Cir. 2013).

The PSR notes that the average sentence at an offense level of 31 and

criminal history category I is 54 months; however, this case involves several

16

aggravating circumstances. First, Morrison perpetrated his corruption in a manner that makes the financial loss to the district unquantifiable.  Second, in addition to lying to the school board, Morrison also lied to State of Michigan auditors during their audit of the district's contracting practices. Third, instead of following the laws required of all taxpayers, Morrison lied to the Internal Revenue Service and evaded the payment of $118,200. Notably, his sentencing guideline range was not increased based upon his tax evasion conviction. *See* PSR ¶¶ 41-44.

Consideration of stiffer white-collar penalties applies particularly to public corruption cases. In November 2004, the Sentencing Commission amended the guidelines to increase the punishment for corrupt public officials. The Commission explained that "public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses," especially when compared with other white-collar crimes. USSG, App'x C, Vol. III, at 82 (Amendment 666). The Commission thus increased the base offense level for public officials, because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." *Id.*

Districts around the country have imposed sentences comparable to the range applicable in this case. For example:

➢ **James C. Dimora and Frank P. Russo**:  Nos. 10-CR-387 and 10-CR-384 (N.D. Ohio). In 2011, former Cuyahoga County Commissioner Jimmy Dimora was convicted of racketeering and bribery-related crimes for accepting items of value in return for helping contractors obtain county contracts, grants, and loans, and helping others secure county employment and salary raises. He was sentenced to 336 months (28 years) in prison based on his receipt of $451,000 in personal benefits. In a related case, former Cuyahoga County Auditor Frank Russo pleaded guilty to accepting more than $1 million in return for $21.4 million in county real estate appraisal contracts, as well as other bribery schemes involving jobs and salary increases. Russo received a prison sentence of 262 months (almost 22 years).

➢ **Kerry F. Khan**:  *United States v. Khan*, 550 Fed. Appx. (D.C. Cir. 2013). In 2013, former U.S. Army Corps of Engineers manager, Kerry Khan, was sentenced to more than 19 years in prison for engaging in a $30 million bribery and kickback scheme involving fraudulent and inflated invoices. As a result of Khan's substantial assistance, the Government recommended a downward departure under Section 5K1.1 of the guidelines which resulted in a total offense level of 36 (188-235 months).

➢ **Mark Ciavarella and Michael Conahan**: No. 09-CR-00272 (M.D. Pa.),

*aff'd*, *United States v. Ciavarella,* 716 F.3d 705 (3d Cir. 2013). In 2009,

Ciavarella and Conahan, both judges with the Luzerne County Court of

Common Pleas, were charged with racketeering for accepting a total of

$2.8 million from the owners of several juvenile detention centers in

return for their support in the construction and operation of the facilities,

as well as for their failure to disclose their conflicts of interest when

placing juvenile offenders at the facilities. Ciaveralla was convicted at

trial and sentenced to 336 months (28 years) in prison. Conahan pleaded

guilty and was sentenced to 210 months (17.5 years) in prison.

Morrison was a public official charged with honestly administering the

taxpayer's money. A sentence within the guideline range would be consistent with

the nation's other comparable corruption cases, as well as with Morrison's

egregious criminal conduct.

## **CONCLUSION**

Based on all of the § 3553(a) factors and to acknowledge the significant

impact on the Madison District Public Schools as described in Victim Impact

Statements, the Court should impose a sentence at the midpoint of the guideline range.

                                        Respectfully submitted,

                                        DAWN N. ISON
                                        United States Attorney


                                        s/KAREN L. REYNOLDS
                                        Assistant United States Attorney
                                        211 W. Fort St., Ste. 2001
                                        Detroit, Michigan 48226
                                        Phone: 313-226-9672
                                        Email:  karen.reynolds@usdoj.gov


                                        s/SARAH RESNICK COHEN
                                        Assistant United States Attorney
                                        211 W. Fort St., Ste. 2001
                                        Detroit, Michigan 48226
                                        Phone: (313) 226-9637
                                        Email: sarah.cohen@usdoj.gov

Dated:  August 21, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to:

Rhonda R. Brazile
**Rhonda_Brazile@fd.org**


s/*Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant U.S. Attorney

Dated:  August 21, 2023